IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

MAR 2 4 2025

KEVIN P. WEIMER, Clerk
By: _____ Deputy Clerk

Brenton Smith, Plaintiff,

]
]
]

v.

]
]

Civil Action No.  1 1:25-cv-00066-SEG
Summary Judgment  REQUESTED

United States, Defendant.

]
]
]

# PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS

Comes now, Plaintiff (Brenton Smith), to respond to Defendents' Motion To Dismiss Civil Action No.  1 1:25-cv-00066-SEG.

## 1. INTRODUCTION

Defendants responded to Plaintiff's civil complaint seeking an injunction that stays the enforcement of the Social Security Fairness Act (SSFA). Defendants seek to have the complaint dismissed for various reasons, and Plaintiff respectfully requests that this Court reject the Defendants' motion, as follows.

a. Plaintiff answers the Defendants' claim "This Court lacks subject matter jurisdiction over the complaint" (p.2) in section 3. Court's Authority.

b. Plaintiff answers the Defendants' claim "Smith's alleged injury is not specific to him" (p.6) in section 4. A Generalized Injury.

d. Plaintiff answers the Defendants' claim "Smith has failed  to allege an injury in fact" (p.6) in section 5. Injury In Fact.

e. Plaintiff answers the Defendants' claim that Social Security benefits for eligible beneficiaries are "speculative" and "abstract" in nature (p. 4 and P. 3) in 6. Social Security Is A Benefits Scheme.

f. Plaintiff has listed Facts in Appendix A in support of this response. Facts are separated by those that Plaintiff believes to be accepted and those facts which are asserted by the Plaintiff.

g. Plaintiff lists the constitutional issues raised Section 2 - Issues Raised.

## 2. ISSUES RAISED

a. Social Security is not on trial. The issue driving this complaint is power, and whether Defendants have the constitutional authority to spend money as promulgated under the SSFA.

   i. Plaintiff asserts that Social Security is an accepted public good which promotes the general welfare. Plaintiff alleges that Congress does not have the power under the Constitution to pay people not to use Social Security, as it would degrade the "general welfare" - specifically that of Plaintiff.

   ii. Plaintiff alleges that the authorization of expense is plainly arbitrary, and does not meet the standard of "money spent in the aid of the general welfare" as set forth in Helvering v Davis (1937)

b. If Congress has the power to spend money to degrade the "general welfare", did Defendants provide Due Process to those future retirees who have been deprived of economic liberty and income security by this reckless giveaway.

c. Plaintiff raises the issue that Social Security is a transitory welfare program rather than a benefits scheme as described in Helvering v Davis (1937). If Social Security is a welfare program rather than old-age insurance, reductions in the future cannot equate to harm in the present. The nature of Social Security is a defining point of this complaint.

d. Calling an expense "Social Security" does not make it constitutional.

## 3. COURT'S AUTHORITY

In Helvering V Davis (1937), the Supreme Court of the United States reserved the right for federal courts to review expenses authorized by Congress under Constitution, Art. I, section 8; money spent "in aid of the 'general welfare.'" In that ruling, the Court ruled that Congress had the discretion to define "general welfare", and instructed all courts to respect that decision, unless that judgment was plainly arbitrary.

The Court used the term "unless" twice, so it is clear this Court has the authority to review any and all  amendments to the Social Security Act to determine whether the expense is plainly arbitrary. Further, the word "unless" means that the passage of legislation alone does not bypass the standard of  "plainly arbitrary."  The Court's decision put the burden of interpreting the meaning of "arbitrary" on a case by case basis by a judge.

Specifically,

> "Congress may spend money in aid of the "general welfare." Constitution, Art. I, section 8; United States v. Butler, 297 U. S. 1, 297 U. S. 65; Steward Machine Co. v. Davis, supra."

> "In drawing the line between what is "general" welfare, and what is particular, the determination of Congress must be respected by the courts, unless it be plainly arbitrary. P. 301 U. S. 640."

> The line must still be drawn between one welfare and another, between particular and general. Where this shall be placed cannot be known through a formula in advance of the event. There is a middle ground, or certainly a penumbra, in which discretion is at large. The discretion, however, is not confided to the courts. The discretion belongs to Congress, unless the choice is clearly wrong, a display of arbitrary power, not an exercise of judgment. This is now familiar law.

In summary, simply calling an expense "Social Security" does not by itself make the statute constitutional. The standard for "purely arbitrary" applied by the Supreme Court of the United States is listed in Appendix B.

## 4. A GENERALIZED INJURY

Defendendents seek a reprieve from this action claiming that "Smith's alleged injury is not specific to him" (P.6). The claim of harm is specific to the Plaintiff. The fact that other Americans are to some degree harmed in a similar manner does not make the harm "generalized".

Defendants define generalized as "undifferentiated and common to all members of the public" (p.4). Yes, <u>virtually</u> all Americans are affected, but not all and not equally. The fact is some beneficiaries will make serious bank on this legislation.

## 5. AN INJURY OF FACT

Defendants seek a reprieve from this action claiming that "Smith has failed to allege an "injury in fact"" (P.6).

(1) Part of this complaint (section 2.b) alleges that Defendants failed to provide Due Process to individuals harmed by the SSFA.

(2) Part of that claim (5.1) is Defendants failed to collect any data on the impact of the SSFA on those harmed by the SSFA. As established in established facts, current law does not define how the benefit reductions caused by the unconstitutional expenses of the SSFA would be allocated to the individual eligible beneficiary.

(3) As established in the asserted facts, the program's shortfall over the next 75 years will increase by $904B by the enactment of the SSFA. This figure is the estimated collective promises under current law to current voters that will not be kept as a result of the enactment of SSFA.

(4) It is possible to establish that Plaintiff is part of the pool of current voters who will be harmed by the enactment of the SSFA. It is not possible to even estimate the portion of that harm that falls on Plaintiff.

(5) The reason that the "Injury In Fact" is unknown is because defendants failed to consider the possibility that anyone would be deprived of their economic liberty and income security as a consequence of the SSFA.

(6) Plaintiff concedes that Congress may take actions in the future to address the "Injury In Fact". (p. 6) The possibility that Defendants might alleviate the "Injury In Fact" does not actually eliminate the "Injury In Fact."

At some level, this Court must decide upon the nature of Social Security. If it is a transitory month-to-month welfare program or an insurance program that provides protection to younger Americans who have no idea how long they will live. The fact that younger Americans have no idea how long they will live makes the power of government to dilute protections with unconstitutional expenses that much more dangerous.

## 6. THE NATURE OF SOCIAL SECURITY

The Plaintiff argues that the Social Security system provides old-age insurance benefits. Yet, Defendants seek to dismiss this complaint based on the fact that the injury is unknown, when the whole purpose of insurance is to protect one from the unknown.

The Defendants appear to assert a requirement to establish standing is the harm must be imminent or actual. Thus, eligible beneficiaries for Social Security do not have any expectation of future benefits beyond the "imminent" time frame. On the other hand, Social Security provides longevity insurance which by design covers expenses far in the future.

Thus, this complaint will hinge on the nature of Social Security. Is it old-age insurance or a welfare program?

Much like auto insurance, Social Security provides financial compensation for realized risk. Plaintiff does not know how many meals Plaintiff might eat at the age of 90, creating a risk for which longevity insurance is required. In like manner, individuals do not know how many auto wrecks they might have so they buy auto insurance. The number of auto wrecks is the unknown.

The insurance is the protection from the unknown. Insurance is not abstract or speculative - it is specifically a hedge against the cost of the unknown.

In Helvering v Davis (1937), Defendants previously asserted that Social Security was a scheme of benefits run on "accepted actuarial principles." Today Defendants argue that these benefits are speculative and abstract. Thus, Defendants claim no one can assert harm from future losses as a result of the unconstitutional expenses authorized by any act, including the SSFA.

Purely as a citation of contrast, Charles Schwab's Financial Advisory Group published a quote from Susan Hirshman (director of wealth management here at the Schwab Center for Financial Research) said : " The issue is that in 10 years, when there is no longer a trust fund to dip into, the money coming in won't be able to cover 100% of the estimated payments to be paid out. Instead, statisticians believe it will be more in the range of, say, 83% of the scheduled benefits."[1]

Plaintiff asserts that Charles Schwab is a financial institution which is legally required to understand the nature of Social Security as part of providing retirement planning advice. The advice may be right or wrong, but the Director of Wealth Management serves as a proxy of financial professionals who do not believe that Social Security is a month to month benefit.

Plaintiff has considered Social Security as part of his retirement plan for 30 years, and believes that it is an integral part of his plan for the balance of his life. The impact of changes is felt today in that plan. To illustrate, Plaintiffs wife works today because this individual is not eligible for spousal benefits created by the SSFA for those who work without contributing to Social Security. Plaintiff's spouse has contributed too much to Social Security to qualify for a spousal benefit.

The Court must determine whether Social Security is a month to month welfare payment in which even eligible beneficiaries have no expectation of payment beyond the 'imminent' time frame. If so, this case is done.

## 7.  CONGRESS CLEARLY CAN CHANGE SOCIAL SECURITY

No one questions the power of Congress to change Social Security. At issue in this case, does Congress have the authority to authorize unconstitutional payments from Social Security to the

---

[1] Social Security: A Smart Part of Financial Planning | Charles Schwab, taken from the transcript

detriment of Plaintiff (and millions of other Americans) without Due Process.

In Flemming v. Nestor (1960), the Supreme Court of the United States ruled that even eligible beneficiaries do not have an earned interest in the payment of benefits. In that case, Congress, in a deliberative exercise, determined to exclude certain beneficiaries from the eligibility for benefits.  If Congress wished, Defendants could expressly reduce the benefits of individuals who file suit in Federal Court - provided that the decision was not purely arbitrary.

That process did not happen with the SSFA. Congress hasn't made a deliberative judgement about the benefits of future retirees. Defendants authorized unconstitutional payments from Social Security which will cause great harm to Plaintiff and millions of other Americans with no visible concern about the loss of economic liberty and income security.

# CONCLUSION

Based on the foregoing responses, Plaintiff lacks standing in the case if and only if Social Security is a month to month benefit program where even eligible beneficiaries have no expectation of payment. As insurance, the protection against future risk is real and substantive today. Thus the Plaintiff has both standing and has presented an "injury in fact", which is not "generalized" as defined by Defendants, even though the injury affects most living Americans.

As explained in the issues raised: any amendment to the Social Security Act is subject to this Court's judgment of whether the statute is "plainly arbitrary". The constitutional authority for the SSFA cannot be to aid the "general welfare." Finally, Defendants have not established Due Process was provided to those eligible beneficiaries for the deprivation of economic liberty and income security created by the SSFA.

Respectfully submitted this date March 24, 2025.

Brenton Smith, Pro-Se

# APPENDIX A: FACTS

## UNCONTESTED FACTS

(1) Social Security was deemed to be constitutional in Helvering v. Davis, 301 US 619 (1937), "Constitution, Art. I, section 8; Congress may spend money in aid of the "general welfare."

(2) On January 5th, 2025, President Joe Biden signed the "Social Security Fairness Act of 2023" into law.

(3) On January 9th, 2025, Plaintiff filed a civil complaint (Civil Action No. 1 1:25-cv-00066-SEG) asserting that the expenses authorized by that law are unconstitutional.

(4) On January 9th, 2025, Plaintiff provided Respondent with a legal game plan so that parties could find a resolution to the dispute as rapidly as possible.

(5) On February 5th, 2025, Plaintiff filed a motion for an expedited hearing.

(6) On March 5th, 2025, the Social Security Administration issued a statement that "The Social Security Administration (SSA) today shared its significant progress to quickly implement the Social Security Fairness Act. Through March 4, 2025, SSA has already paid 1,127,723 people more than $7.5 billion in retroactive payments."[2]

(7) The SSFA repeals the Government Pension Offset ("GPO"), established in 1977,  and the Windfall Elimination Provision ("WEP"), established in 1983

(8) According to the Social Security Administration, the most current forecast for the Old-Age Survivor Insurance Trust Fund ("OASI") is projected to have sufficient reserves to pay full benefits on time until 2033. Legislative action will be needed to prevent OASI reserve depletion. In the absence of such legislation, continuing income to the trust funds at the time of reserve depletion would be sufficient to pay 79 percent of OASI benefits.[3] That estimate assumes a reasonably robust economy.

(9) In the event of systemic benefit reductions, the government does not know how the systemwide reduction would be applied to the individual beneficiary. In the words of the

---

[2] www.blog.ssa.gov/social-security-pays-billions-of-dollars-in-retroactive-payments/
[3] Social Security Administration (Pub. May 6, 2024). E. CONCLUSIONE. CONCLUSION. . ssa.gov. https://www.ssa.gov/oact/tr/2024/II_E_conclu.html#86802

Congressional Research Service "It is unclear what specific actions SSA would take if a trust fund were insolvent."[4]

(10)    In the case of the OASI Trust Fund, the increase in expenses mandated by the SSFA would force benefit reductions applied to people like me, and millions of other Americans who will be eligible for benefits in the future.

(11)    These workers are legally required to contribute to and will benefit from an employer run pension. So they already receive a pension just like Social Security.

# ASSERTED FACTS

(1) Helvering v. Davis | 301 U.S. 619 (1937)[5] is the relevant case law.

(2) Not everyone works in a job covered by Social Security. Where one works is a choice. What one does is a choice. Individuals, who work for an employer who does not participate in Social Security, have "opted-out" of Social Security for the purposes of this complaint. Whether the decision was informed or not, is not relevant.

(3) Workers who opt-out of Social Security are required to contribute to and benefit from an employer pension plan that serves as a replacement Social Security. Income security for these workers is computed as Social Security benefits + benefits from their replacement Social Security

(4) Historically, all workers have been subject to an adjustment as part of claiming spousal or survivor benefits under the work record of the spouse. Now only workers who contribute to Social Security will face a full adjustment. The more anyone works without contributing to Social Security the better the spousal benefit will be.

(5) These individuals may have opted out from Social Security for the entirety of their career or a portion thereof. All have worked without contributing to Social Security, and all have contributed to and benefit from a pension during the time in lieu of Social Security.

(6) The individuals who will receive increased benefits do not have a unique need in old-age which requires incremental benefits. Working without contributing to Social Security

---

[4] Congress.Gov (2025, March 18). Social Security: What Would Happen If the Trust Funds Ran Out?. https://www.congress.gov/crs-product/RL33514

[5] HELVERING v. DAVIS. 619. Library of Congress.", Retrieved March 20, 2025 from https://tile.loc.gov/storage-services/service/ll/usrep/usrep301/usrep301619/usrep301619.pdf.

does not alone create hazards for these retirees.

(7) Congress failed to provide due process when it passed legislation which will deprive millions of future retirees of their income security in old age. Specifically, Congress decided to pay for these benefits by the more rapid depletion of the Social Security Trust Funds, specifically the Old-Age Survivors Trust Fund. The only thing that future retirees know is that their benefit reduction will arrive sooner, and hit harder.

(8) The SSFA changes the valuation of work within the benefits formula, specifically the legislation provides an increase in benefits to those who work without contributing to Social Security.

(9) The concept of "Fairness" is an arbitrary concept which generally means the equitable and impartial application of law and justice. In this case, Congress has authorized the Social Security Administration to pay more to those who did not contribute to Social Security than those who have contributed, without any explanation of "fair".

(10)   The SSFA does not raise revenue to pay for the increase in benefits. As such, the legislation does not expand benefits for anyone. It reallocates scheduled benefits from one beneficiary to another. In this case, it takes money from future retirees (such as the Plaintiff) and gives it to current retirees.

(11)   The Social Security Administration is the premier source for data on the impact of the depletion of the Social Security Trust Funds.

(12)   The Social Security Administration published on July 20, 2022, analysis of a similar legislative proposal, the Social Security Fairness Act of 2021. That analysis suggests that the actuarial balance of the combined OASIDI systems would decline by 0.04%, which represents the higher cost offset by an increase in taxation of benefits.

(13)   The OASDI analysis does not conform to current law which prohibits the Social Security Administration from shifting cash between resources.

(14)   As established in accepted facts, the shortfall today is $22.6 trillion on the combined Trust Funds. So a decrease in the actuarial balance would be $1.04*22.6T = 904B$.

(15)   The Social Security Administration reports that net impact of the SSFA will accelerate the depletion of the associated Trust Fund[6]. These estimates provided to

---

[6] "Estimate of the Financial Effects on Social Security of H.R. 82, the "Social Security Fairness Act of 2021," introduced on January 4, 2021 by Representatives Rodney Davis and Abigail Spanberger. The

Congress do not conform to current law.  OASDI estimates by any source presume cashflows not allowed under current law.

(16)    The projections were based on the 2021 Trustees Report for the Social Security Trust Funds. That analysis reflects data and assumptions which are at least 4 years out of date.

---

United States Social Security Administration | SSA. (Pub July 20, 2022). Retrieved March 20, 2025 from https://www.ssa.gov/oact/solvency/DavisSpanberger_20220720.pdf "

# APPENDIX B: The Test Of Plainly Arbitrary

For the purpose of clarity, Plaintiff explains the standard that the Supreme Court of the United States applied in the decision in the Helvering v Davis (1937). In that case, the Court ruled that Congress did not "improvise judgment" in the enactment of the legislation. The Court set a visible standard for the government's claim on the "general welfare" clause as a basis of constitutional authority for any law.

(a) In Helvering, the Court identified a clear objective of the legislation. The statue served to save men and women from the rigors of the poor house and the fears thereof.

(b) The Court identified a clear example of the concern that legislation hoped to solve "With the loss of savings inevitable in periods of idleness, the fate of workers over 65, when thrown out of work, is little less than desperate." This visual example shows that the Court expects Defendants to have a clear objective rather than an abstract conceptual goal in mind.

(c) The Court considered substantive evidence that the legislation would fulfill that objective, and provided specific evidence that supported the goals of the legislation. The Court did not take the government's word without evidence that the legislation had the possibility of fulfilling that goal.

(d) Finally, the Court specifically ruled that Congress did not "improvise judgement" based on the fact that there was a clear purpose and "a great mass of evidence" that the policy enacted by the legislation would achieve the objective.

(e) The standard is not high, Congress must have some idea of how legislation would improve the general welfare, some evidence that there is a problem, and evidence that there is at least a hope that legislation might affect the policy expressed in the statute.

(f) The SSFA has none of this. It has no purpose, nor evidence that there is a problem caused by working without contributing to Social Security. There is no hope that the SSFA might improve the general welfare. It moves money pocket to pocket for no particular reason.

Specifically,

> "The hope behind this statute is to save men and women from the rigors of the poor house as well as from the haunting fear that such a lot awaits them when journey's end is near."

> "Congress did not improvise a judgment when it found that the award of old age benefits would be conducive to the general welfare. The President's Committee on Economic Security made an investigation and report, aided by a research staff of Government officers and employees, and by an Advisory Council and seven other advisory groups. Extensive hearings followed before the House Committee on Ways and Means, and the Senate Committee on Finance. A great mass of evidence was brought together supporting the policy which finds expression in the act. Among the relevant facts are these: the number of persons in the United States 65 years of age or over is increasing proportionately as well as absolutely. What is even more important, the number of such persons unable to take care of themselves is growing at a threatening pace. More and more, our population is becoming urban and industrial, instead of rural and agricultural. The evidence is impressive that, among industrial workers, the younger men and women are preferred over the older. In times of retrenchment, the older are commonly the first to go, and even if retained, their wages are likely to be lowered. The plight of men and women at so low an age as 40 is hard, almost hopeless, when they are driven to seek for reemployment. Statistics are in the brief. A few illustrations will be chosen from many there collected. In 1930, out of 224 American factories investigated, 71, or almost one third, had fixed maximum hiring age limits; in 4 plants, the limit was under 40; in 41, it was under 46. In the other 153 plants, there were no fixed limits, but in practice few were hired if they were over 50 years of age. With the loss of savings inevitable in periods of idleness, the fate of workers over 65, when thrown out of work, is little less than desperate. A recent study of the Social Security Board informs us that "one-fifth of the aged in the United States were receiving old-age assistance, emergency relief, institutional care, employment under the works program, or some other form of aid from

> public or private funds; two-fifths to one-half were dependent on friends and
> relatives, one-eighth had some income from earnings, and possibly one-sixth had
> some savings or property. Approximately three out of four persons 65 or over
> were probably dependent wholly or partially on others for support. Wappene
> summarize in the margin the results of other studies by state and national
> commissions. They point the same way."

In order to invoke the "General Welfare" clause, Defendants should be prepared to provide a
reasonable policy for the legislation and evidence of "a hope" that the statute could effect that
policy. Otherwise, the SSFA simply moves money pocket to pocket for no particular reason.

a) substantial evidence that working without contributing to Social Security creates a unique
   risk in old-age that other Americans do not face.

b) evidence that someone like Jill Biden (a career educator) or someone like Melania Trump
   (an immigrant who may have a substantial outside pension) face obstacles in retirement
   that other working Americans do not.

c) an understanding of why Congress intends to create a gap in retirement income security
   of more than $400,000 between identical teachers with identical work histories married to
   identical spouses; for the sole reason that one of them worked without contributing to
   Social Security. (Explained in Appendix C)

Absent a response from Defendants, it is not possible to promote the "general welfare" by
encouraging people to not use Social Security.

(a) As established in accepted facts,. Social Security represents a public good, and serves to
    aid the "General Welfare".

(b) As established in accepted facts, the SSFA creates economic windfalls for those who do
    not participate in Social Security. These windfalls serve as an incentive for people to
    opt-out of Social Security. The cash incentive equates to paying people to not participate
    in Social Security.

(c) Paying people to not use Social Security inherently degraded the "general welfare".

# APPENDIX C: ILLUSTRATIONS OF THE GPO

*The SSFA creates a gap in income security during retirement years of that can exceed $400,000 purely as a reward for working without contributing to Social Security.*

(1) Historically, all workers have been subject to an adjustment as part of claiming spousal or survivor benefits under the work record of the spouse.

    (a) For those who contributed to Social Security, a claimant only collects the higher of the earned benefit under their own record or the benefit earned under the record of their spouse. In other words, a worker who contributes to Social Security must forego 100% of their earned pension in order to collect spousal or survivor benefits.

    (b) Prior to the enactment of the SSFA, those who worked without contributing to Social Security were required to forego 2/3rds of their earned pension as part of collecting spousal/survivor benefits. This adjustment was called the Government Pension Offset.

(2) Historically, the GPO applied to spousal and survivor benefits collected by individuals who have earned a pension from work, which did not withhold payroll taxes for Social Security. These individuals choose to work for an employer who did not participate in Social Security. Whether that choice was an informed decision is not relevant.

(3) As a result of the enactment of the SSFA, those individuals who work without contributing to Social Security to collect spousal or survivor benefits without any adjustment. Thus beneficiaries with like work histories in like careers will collect unequal benefits from their spouse's record.

(4) The SSFA creates a gap in eligible spousal benefits of more than $400,000 between those individuals who opt-out of Social Security versus those individuals who contribute to Social Security for a lifetime.

    (a) Specifically, if you consider teachers with a like work-history, married to a career Congressman, the gap between the Social Security benefits for identical teachers exceeds $400,000, purely for the decision to work for an employer which does not

participate in Social Security.

(b) With spousal benefits, the most you can collect is 50% of your spouse's or ex-spouse's benefit amount at their full retirement age. Starting in 2025, the maximum possible benefit at full retirement age will be $4,018[7] per month, meaning the maximum spousal or divorce benefit will be $2,009 per month.

(c) "More than $400,000" is a conservative expression. It is based on someone reaching full retirement age in 2025. The gap in income security is expected to rise with time because Social Security expands benefits every year as a consequence of wage indexing. (20*12* $2,009) = $482,160.

(d) TheHill reported that the average teacher in the United States earns $69,544. At that salary over a career

(e) According to the Social Security Administration the average worker earns 66,621.80.[8] The primary insurance amount for such a worker would be $1,907 per month. Thus the maximum an average worker could collect in spousal benefits would be $2,009-1907 or $102. Over a lifetime, this worker could get more than $450,000 less in spousal benefits than a retiree with a like earnings history simply because the worker contributed to Social Security over a full career.

(5) There is an infinite combination of possible spousal and survivor benefits. For the purposes of this motion, the Congressional Research Service provides a realistic example of the GPO's impact on spousal benefit for a generic couple with identical work records, where the only difference is whether one spouse contributes to Social Security or not.

(a) Under the GPO, the Mary who did not contribute a penny to Social Security will under the current rules get more than three times as much in spousal benefits as the Mary who did contribute to the program.

(b) With the enactment of the SSFA, the Mary who did not contribute a penny to Social Security will receive ten times as much in spousal benefits as the Mary who contributed to the program for an entire career.

---

[7] Social Security Adminstration. (2025, January 2). What is the maximum Social Security retirement benefit payable?
https://www.ssa.gov/faqs/en/questions/KA-01897.html#:~:text=The%20maximum%20benefit%20depends%20on,maximum%20benefit%20would%20be%20%245%2C108.
[8] *National Average Wage Index*. The United States Social Security Administration | SSA. (n.d.). Retrieved March 20, 2025 from https://www.ssa.gov/oact/cola/AWI.html.

(c) Over 20 years, roughly the life expectancy of a retiree today, the gap between the Marys in expected benefits created by the SSFA is $216,000.($900*12*20.) The legislation provides this sum in projected spousal benefits to the retirement picture of the Mary who chose to work without contributing to Social Security..

When one considers retirees of similar profiles, the same work history, the same spouse, where the only difference is the decision to work without contributing to Social Security, the SSFA creates large gaps in income security between beneficiaries.

# APPENDIX C AN ILLUSTRATION FROM THE CONGRESSIONAL BUDGET OFFICE[9]

*Congress is giving $216,000 to retirees -*
*provided that you don't pay into Social Security*

The following illustration is drawn from an example provided in the Congressional Research Service analysis of the GPO.

| | Benefit From Work Related Pension | Eligible Benefit W/ Current GPO | |
| --- | --- | --- | --- |
| | | Spousal | Widow/Widower |
| John Covered By Social Security | $2,000 | | $0 |
| Mary Covered By Social Security | $900 | $100 | $2,000 |
| Mary Does Not Contribute To Social Security | $900 | $333 | $1,333 |
| Under The Social Security Fairness Act, | | | |
| Mary Does Not | $900 | $1,000 | $2,000 |

---

[9] "Will Republicans Approve Quarter-Million Dollar Windfalls For Government Employees?",Andrew Biggs, Will Republicans Approve Quarter-Million Dollar Windfalls For Government Employees?

|  | Benefit From Work Related Pension | Eligible Benefit W/ Current GPO | |
| --- | --- | --- | --- |
|  |  | Spousal | Widow/Widower |
| John Covered By Social Security | $2,000 |  | $0 |
| Mary Covered By Social Security | $900 | $100 | $2,000 |
| Contribute To Social Security |  |  |  |

1) Under current rules, Mary who contributes to Social Security collects less than 1/3rd what Mary who doesn't contribute to Social Security.

2) After John passes away, both Mary's would be eligible for Survivor Benefits. In order to collect the $2,000 of survivor benefits "**Mary Covered By Social Security**" would have to give up 100% of her earned pension, whereas "**Mary Not Covered By Social Security**" would collect $900. While these workers have identical work histories, one will retire with $900 more than the other, solely because of the decision to work for an employer that does not participate in Social Security.

3) At all points of retirement, the Mary which did not contribute to Social Security would get $900 more per month than the Mary who did contribute to Social Security. Over 20 years, the typical length of retirement, this creates a financial incentive of $216,000.

# APPENDIX D: WEP

(1) The Windfall Elimination Provision or "WEP was created in 1983 based on the recommendations of the National Commission on Social Security Reform (aka The Greenspan Commission),

(2) The National Commission on Social Security Reform concluded that benefit formula contained

> "relatively large OASDI benefits that can accrue to individuals who spend most of their working careers in noncovered employment from which they derive pension rights, but who also become eligible for OASDI benefits as a result of relatively short periods in covered employment with other employers.

(3) The National Commission on Social Security Reform attributed the disproportional benefit to the benefit formula.

> "This results from the weighted benefit formula, which treats these individuals in the same manner as if they were long-service, low-earnings workers.In other words, people who work without contributing to Social Security will get better benefits than those with comparable work histories who participate exclusively in Social Security."

(4) In response to the inequitable distribution of benefits, the National Commission on Social Security Reform recommended that the benefit formula should be revised as to eliminate such "windfall" benefits. Specifically, the National Commission believes that these individuals should receive benefits which are more nearly of a proportionate basis than the heavily-weighted benefits now provided.

> "The result of such a work history is to produce OASDI benefits that contain "windfall" elements -- the benefits payable are relatively high compared to the proportion of time spent and the OASDI taxes paid during covered employment."

(5) In layman terms,

    a) The benefit formula of Security is progressive by design: Those with long and productive careers subsize those who were less successful in their working years.

    b) As a result of a system defect, the benefits formula treats those who split their career between covered and non-covered work as individuals who struggled to find full time work. Thus, the retirees collect benefits on terms that were meant for those who struggled to find work

    c) As a result of a system defect, retirees who work long careers divided between covered and uncovered work escape the subsidy paid by long-term workers who only work in Social Security.

    d) The WEP was created at the recommendation of a national commission to protect future beneficiaries from a system defect which overpays certain retirees.

Whether the WEP is accurate is not relevant to this complaint. The system defect is well known. If it is an inaccurate adjustment Congress has the obligation to address the legislation which is clearly wrong. To blindly remove the WEP rewards those who opt-out of Social Security for a portion of their career with benefits that far exceed what they would earn as a career worker who only participates in Social Security.

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the Petitioner's Complaint and Summons via certified mail to:

Richard S. Moultrie, Jr.
Acting U.S. Attorney for the Northern District Of Georgia
75 Ted Turner Drive, SW
Atlanta, GA 30303-3309

The Honorable Pamela Bondi
Attorney General of the United States
950 Pennsylvania Ave., NW,
Washington, D.C. 20530

### As Courtesy Copies

Acting Commissioner Leland Dudek
Office of the General Counsel
Social Security Administration
6401 Security Boulevard
Baltimore, MD 21235

Assistant Attorney General for Administration
U.S. Department of Justice
Justice Management Division
950 Pennsylvania Avenue, NW
Room 1111
Washington, DC 20530

Respectfully submitted this 24th day of March, 2025.


Brenton Smith
brentoncsmith@yahoo.com